All right, Mr. Shoemaker, whenever you're ready. May it please the court, good morning. My name is Jamie Shoemaker, and I am here on behalf of the six appellants in this case. Judge Jackson's opinion in this case should be reversed for three reasons. First, Sheriff Roberts clearly harbored retaliatory animus against anyone who opposed him politically. Second, he created a political cauldron in the Hampton Sheriff's Office where his senior officers went out, they learned who their employees were supporting, they learned about their political activity, the sheriff learned about these six appellants in particular, and he fired them for supporting his opponent. Third, the sheriff is not entitled to qualified immunity in this case. In November of 2009, he was facing re-election, and he was facing a tough opponent. And at the beginning of the campaign season, he learned that two of his employees were on Facebook supporting his opponent. He held shift change meetings, three of them, where he essentially said, if you get online supporting my opponent, you're going to be fired. That's essentially what he said. After one of those meetings, the meeting at which Danny Carter was in attendance, he made an angry and aggressive approach to Deputy Carter, and he told him, that's it, you've made your bed, now you're going to lie in it. After the election, you are out of here. This is that rare case where there is direct evidence of the animus and direct evidence of the motive. Before we get there, what about sovereign immunity? Has immunity been abrogated by the Commonwealth of Virginia here? Judge, in his official capacity, the only thing for which he can be held liable, in his official capacity, would be the claim for reinstatement. But that clearly is on the table. Judge Jackson seemed to wipe that off the table. Clearly we are entitled to seek reinstatement even in the face of 11th Amendment immunity. We are not entitled to proceed against him for monetary damages in his official capacity, but we are in his individual capacity. And qualified immunity does not lie. It simply does not. Why not? Knight v. Vernon is clear. Knight v. Vernon clearly establishes the contours, the legal contours that apply in this case. In that case, Sheriff Vernon, down in the Middle District of North Carolina, was facing a situation where, just almost exactly like this one, in fact, if there is any difference between our case and the Knight v. Vernon case, the fact is, Kathy Knight had a weaker case than my clients do. She was a jailer, like four of my six clients. Her terms of employment, her job duties, were almost the same as four of my six clients. She was accused of various inappropriate conduct. The Sheriff actually commissioned a detective to investigate it. The detective came back and supported much of it, and so the District Court, relying on the Medford decisions, Medford v. Jenkins, said, hey, no. She's not entitled to First Amendment protection anyway. We're granting summary judgment. The Fourth Circuit reversed the District Court and said, listen, this is just a jailer. And they drew a bright line of demarcation between law enforcement officers who have general and immediate powers of arrest and ministerial employees like jailers and the administrative employees in this case. So, Knight v. Vernon, weren't your clients all sworn deputies? No, the administrative employees were not. It is true that the, that the, all six of them, no, no, no ma'am, let me, the four deputies were indeed sworn, but they were not law enforcement officers under Virginia law. They did not attend the law enforcement course. In 16 years, we, I have a declaration from the former lieutenant colonel in the office, he was the third highest ranking employee in that office, and in 16 years, no one in the Hampton Sheriff's Office had ever made an arrest. That fact is uncontradicted in this record. All the declarations from the plaintiffs and the declarations from the disinterested witnesses all say, we didn't have arrest power, we didn't even, we didn't know we had any arrest power, and we've never arrested anyone. So there is a clear difference between the Medford decision and the law enforcement officers in that case and this case. Knight v. Vernon is on all four points. Knight v. Vernon matches this case. And Knight v. Vernon gives the sheriff fair warning, fair warning about the contours and the legal obligations that he had. In addition to that, he admitted, he knew, he knew that he could not fire these employees for political activity. That is in the record. So, we think it's clear that qualified immunity does not apply here, and he faces liability in his individual capacity. The evidence in this case is extraordinarily powerful, and it is really unique in that regard. There were three shift change meetings and one meeting with administrative employees where he says, you're going to be out of here. He tells Deputy Carter, you've made your bed, now you're going to lie in it. When you look at the summary judgment standard, and you consider the fact that all of this evidence has to be interpreted in a light most favorable to my clients, dismissing this case on summary judgment was clearly inappropriate. In Reeves v. Sanderson Plumbing Products, the United States Supreme Court said that on summary judgment, the trial court must give credence to evidence favoring the non-movement, but only that evidence supporting the moving party that is essentially uncontradicted by sources of objective evidence and disinterested witnesses. Nearly all of Sheriff Roberts' testimony and evidence in this record is from his mouth. It is from him. He is completely interested, not disinterested, as contemplated in Reeves. Now counsel for Facebook has been allotted time to argue on the issue of like as an expression, and I don't want to tread on his time, except to say that in this case, regarding evidence of protected speech, and whether we're talking about Woodward confronting Lieutenant Perkins, whether we're talking about Deputy Dixon expressing his views to Francis Pope at the polling station, or whether we're talking about Deputy Carter and Deputy McCoy being on Facebook, all of those expressions must be viewed in context. They must be taken in the context, and the most critical evidence of the unique context here is Sheriff Roberts said, you get on Facebook, you're out of here. He made it clear that if you support my opponent, I am going to fire you. That evidence is clear in this record. And how many of your clients were on Facebook and there's evidence that the Sheriff was aware of it? Carter and McCoy, I'm sorry. There's evidence that McCoy was on Facebook and that the Sheriff was aware of it. Okay, the evidence is as follows. Captain McGee testified that he learned of McCoy's presence on Facebook and talked about that in the record. He said they were on Facebook and we were all surprised about that because they, referring to McCoy and Carter, seemed to be supporting the Sheriff's opponent. Colonel Bowden, the second in command of the office, testified that she monitored Facebook. She testified that she saw McCoy on Facebook with Carter and that she went to the Sheriff at about the same time. She testified to that. Deputy McCoy, of course, testified in his declaration, I was on Facebook indicating my support for the opponent. Deputy Carter said he saw McCoy and, of course, we have in the file, in the record, Deputy Carter's actual Facebook postings. But there are five or six witnesses in this record who saw McCoy on Facebook. The Sheriff himself admits that McCoy was on Facebook. He said he learned of that. He wasn't sure when he learned of it. After the election. Yes, but the record doesn't say before he fired McCoy. So if you interpret this evidence in the light most favorable to me, it is still the Sheriff having actual knowledge, actual knowledge, that McCoy was on Facebook. So tell me about Woodward on the free speech claim. What is the evidence that Woodward, the Sheriff knew about Woodward's complaints about the petition? Woodward challenged Lieutenant George Perkins when he was circulating a petition in the office and she complained to Perkins and she complained to Collins. What is the evidence the Sheriff knew about that? Judge, the evidence of that is that this office was a sieve and was a suction pump of sorts when it came to political information. All the political information in this office. There's no direct evidence. You're relying on circumstances. That's true. That's true. There's no direct evidence about Woodward's activity actually getting to the Sheriff. But there is ample indirect evidence. This office clearly, it was again a political cauldron where his senior officers felt obligated to report things up to chain of command. Except that I have to assume then that everything was known by everybody. Judge, the political, we have evidence. Clearly there is evidence in this record that the Sheriff was keenly concerned about his political standing with his employees. And in lots of different contexts, the cookout, the Facebook activity, all of that made its way to the Sheriff. I believe a jury could reasonably infer that Woodward's protesting George Perkins' circulating a petition made it to him as well. I believe it's a classic jury question. What about Land? What's the evidence in support of Land's position? He had no knowledge of the Sheriff's reason to fire him. He purchased tickets to the tournament. He didn't attend the picnic. He only discussed the campaign with Ms. Woodward. This is what he says. He didn't take any action that would have indicated support for Adams or non-Judge Robert. Judge Hollander, Bobby Bland was requested by Major Wells Major on several occasions, and it's in his declaration, and it's in the transcripts as well, on several occasions to engage in the same activities that he had engaged in prior to 2009, and he declined to do it. That's the evidence with respect to Bland. The evidence with respect to Bland is very comparable to the evidence with respect to Kathy Knight in Knight v. Vernon. So I think Bobby Bland, under the Knight v. Vernon standard, has met his burden as well. I see that my time is up. Thank you. You've got some time reserved. Mr. Panner? Chief Judge Traxler, and may it please the Court. The District Court in this case rejected plaintiff's free speech claims for at least two of the plaintiffs based on the conclusion that merely liking a Facebook page is insufficient speech to merit constitutional protection, and that holding was incorrect. And this Court should make clear that a like on Facebook is speech that's entitled to the same First Amendment protection as other kinds of traditional speech. Sort of the, I think we start from the proposition that the Supreme Court made clear in Aino v. ACLU, which is that online speech is not entitled to any lesser protection than other types of traditional speech. That was a principle that was clearly established then from the early days of the Internet. Liking a Facebook page, whether it's a political campaign page as it was in this case, or it could be a news article, a website associated with a musical group, or a commercial product, it's part of the rich web of interactions and communications that Facebook enables. And it warrants First Amendment protection. By liking a page on Facebook, a user might communicate her endorsement of a charity or a restaurant, a local business, or as in this case, a political candidate. And that represents a deliberate choice to share preferences or opinions with, again, a range of matters with one's Facebook friends, and possibly as in this case, with a broader audience. Now, the district court held that a like on Facebook is not an actual statement, and therefore not entitled to constitutional protection. But that's simply not correct. As a, first of all, as a factual matter, when someone likes content on Facebook, it does generate literal statements. Here, there would have been a statement that, if it was Carter who liked it, that Carter likes the Adams campaign page, and that would appear then on the Facebook pages of Facebook friends. It also appeared on his Facebook profile page, the home page that people can view. Even if we were to, even if the court were to consider a like to be a symbolic gesture, it would still qualify for First Amendment protection as symbolic speech. Now, affirming in this case that a like on Facebook is entitled to First Amendment protection is very important. It's of vital importance to Facebook and its millions of users, many millions of users in the United States. It's quite central to Facebook's mission to foster interaction, social connection, and sharing of ideas. And really, the extraordinary success of Facebook reflects its effectiveness in doing that, and deepening social interaction among its users. And any suggestion that that sort of communication is entitled to less than full constitutional protection than traditional forms of speech would risk chilling a very valuable form of communication that the internet has made possible. I thank the court for the time. Thank you, Mr. Banner. Mr. Rosen? Good morning. May it please the court, Chief Judge, Jeff Rosen on behalf of Sheriff Roberts. The lower court correctly concluded that none of the appellants engaged in protected speech or proved that the sheriff did not rehire them based upon their political affiliation. Furthermore, the court concluded that the sheriff had qualified immunity when he made the decision not to rehire the defendants. And I would ask the court to view this, analyze this case, although it involves novel issues involving social media, to view it through the lens of qualified immunity, as Judge Jackson did. Because I think the issue is what the state of the law was that would have put the sheriff on notice of whether he could take the action he took. So I would suggest the lens of qualified immunity would be the proper way to start. And the evidence in the case is clear, but three of the appellants, none of them engaged in political or protected speech. Bland, Woodward, and Sandhoffer, all. The record is, there's nothing in the record to suggest that any one of them engaged in political speech or any speech whatsoever. I'm not following you. Sorry. Not that you're saying anything wrong, but I thought you were going to talk about why qualified immunity applied, but now it seems to me you're getting into the merits of the underlying claims. I will, Judge. I'm fine. I just want to know where you're going. I'm fine to follow. I appreciate you. I was just sort of leading off with that. I was leading off to separate the defendants, separate the appellants. So I was going to say that there's no evidence of support for those three that did any speech at all. And the other three of them claiming they did engage in speech, McCoy, Carter, had the Facebook postings, and Dixon had his alleged speech when he left the polling place. And he claims he had a bumper sticker on his car. So I just wanted to put what the evidence is in the record. So then I'll go on to my qualified immunity analysis. I didn't mean to get off topic. So anyway, first, it was not clearly established in December of 2009 that Sheriff Roberts' failure to reappoint the appellants violated the First Amendment right to free speech. And in the Pike v. Osborne case, this court said, we have recognized that in these cases, only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected because the relevant inquiry requires a particularized balancing that is subtle, yet difficult to apply, and not well-defined. And I think that's – and so we'll take – from that guide, we'll take each appellant separately. Well, can I just ask you, though, I know that language that you cite in the case, it certainly sounds helpful to you. But in the Knight case that was decided in 2000, it does seem to suggest that based on the roles that these particular plaintiffs held in their responsibilities for the sheriff, that somehow they wouldn't – there wouldn't be any question that they don't fall under the umbrella of the kind of protection that you're talking about. Well, I think clearly that they fall under the protection of the Jenkins case. Well, there was a police department in Hampton, right? There is a police department. The city of Hampton had its own police force. These – to the extent we're talking about the four who were sheriff's deputies, they didn't have any law enforcement responsibilities as we understand it. Well, that's not – I don't mean we. Right. My panel, I meant that. People tend to think of law enforcement. Well, interesting. In Virginia, sheriff's departments do involve law enforcement roles as well, okay? In Hampton, particularly, they had a police department, but in many counties – They didn't go through the law enforcement training course, for example? No, well, they did go through law enforcement training. They went through the Department of Criminal Justice. But the one that – there's a declaration in the record that they didn't take that specific course that qualified them to be law enforcement officers. Well, Judge, respectfully, I believe that they are law enforcement officers, and under 19-2-81-82, the Virginia Code, they are sworn law enforcement officers, and they have powers of arrest. But their powers – That's Virginia law. But they never – I mean, it's – there wasn't any dispute, I thought, in the record. They didn't exercise any powers of arrest. Well, that's not – In fact, they served summonses, things like that. Isn't that what they did? That's not true, Judge. The four deputies, in fact, worked off-duty as law enforcement at Hampton University, wearing the sheriff's uniform and carrying a gun, and had full powers of arrest. So they were working off-duty – Okay, that – I was referring to their job for the sheriff, though. Well, no, for the jobs of the sheriff, they had a variety of jobs, the sheriff. Some worked in the jail, some worked in civil process. They're out and about in the uniform, armed, and if they see a crime being committed, they are certainly able to perform an arrest. They absolutely are. They absolutely are. So counsel's attempt to try to suggest that they are not law enforcement officers is erroneous, absolutely erroneous under Virginia law, 19281A2. They are sworn law enforcement officers and have power of arrest. That's uncontroverted. So they are trying to analogize the situation to the Knight case is not correct. They certainly fall under the category of the Jenkins case. They are sworn law enforcement officers. They had the power of arrest. In fact, all four of the sworn officers worked, earned money, and were acting as police officers at Hanford University off-duty. And that's in the record. So anyway, so as I was saying, back on the retaliation issue, as I was saying, the three of them really had no evidence of speech for Bland, Woodward, and Sandhoffer. McCoy and Carter, now the issue is whether clicking on Like on Facebook constituted protected speech. And Judge Jackson concluded it was not, relying on the two cases that were in existence, which involved specific expressions of speech, the Mattingly and Gershom cases. In those cases that the judge relied on, they involved postings on Facebook where the actual parties posted substantive comments on Facebook. One in Mattingly, she was a clerk of court. She posted comments about her clerk. In Gershom, she posted comments about an arrest she had made, suggesting improper conduct by another officer. And he said clearly those were comments that, if they touched on a matter of public concern, were protected. Okay, so what does a clicking on Facebook mean? Well, I will tell you, the record in this case shows Deputy McCoy did not realize he was making any statement or any political statement when he clicked on Facebook. It was an accident, accidental posting. And that's clear from the record of Deputy McCoy's testimony. He accidentally posted his picture on Nick Adams' Facebook page. So if he can accidentally post it, how is that protected speech? And I'll point you to the record. He says, he sent Adams an email to wish him good luck on the election, and it ended up on his Facebook page at that time. He didn't know if anyone else would find out about it. That's at the Joint Appendix 156, lines 17 through 25. Then he goes on to say in deposition, he intentionally went on Facebook and emailed Adams, but did not intend to be posted on his website. Joint Appendix 161, line 3 through 6. Then he says if he knew he would be posted on Adams' Facebook website as a supporter, by sending an email, he would not have done that. Joint Appendix 163. And so Judge Jackson, so that is critical. How can you have accidentally protected speech? He didn't realize he was posting his picture on Facebook at the time. And that is the problem with Facebook. You don't know what actions you do and the consequences it has. That might be the problem with the evidence with regard to McCoy's speech, but what about Carter? I don't know that that's a problem with Facebook. Well, no, I agree with you. I agree with you, Judge Thacker. But our position is, and I think Judge Jackson included, it's an automated computer-driven response when you click on a like. It's not a person making speech. You can click on it for a variety of reasons. Perhaps if it was an accident, as you're saying the evidence reveals with regard to Mr. McCoy. But if Mr. Carter intentionally clicked on like because he liked something, regardless of what it was, and it was going to go to the Facebook community, how is that any different than him perhaps putting a yard sign in his yard that says I like Ike or something? That's a good question, and I ask myself the same question. But I think if you look at it, he didn't do that. And that's what Judge Jackson relied on. If you look in the record at Joint Appendix 576 through 578, that's all that's in the record as to what was actually there. And so if you look at that on 576, you see that appears to be Mr. Adams' Facebook page, and on that is a picture of Daniel Carter and his wife, who was also a deputy sheriff and who was reappointed by Sheriff Roberts. You see Daniel R. Carter, Jr. over there on the very bottom below Mr. Adams' picture. So that's all that's there. There's no statement or support for him. That's all that's there. And similarly, when you go to page 5758, that appears to be what was on Carter's Facebook page, and that's a picture of the Carter. I'm sorry, 577, 578, I apologize. Can I go back and ask you about McCoy? His speech being accidental, I didn't recall seeing that. Okay, I'll be glad to. In the brief. Is it in the brief? It should be in the brief. I know it's in the record, Judge, and I was quoting from— I may have dismissed it. I just didn't recall it. Well, I thought it was significant. Is it your position that if somebody says something but they didn't mean to say it, that it's not speech, protected speech, then? Yes, Judge, I think you have to intend to say it. I think you have to intend to say it. You might be right. I don't. Well, I was reading it too. I'm thinking, well, Facebook's position is every time someone clicks on Like, they're saying they're making a firm statement. Well, obviously that's not true, and McCoy proves it's not true. And, in fact, you can click on a Like because you're curious about what it says, or you get a coupon from Target. You can click on their Facebook page and get a Target. It doesn't mean you're making a statement because you're clicking on the Like button. It's an automated process. You click on it, and then you get—it's really like opening a door. Actually, I was thinking about this last night. It's like opening a door into a room. You can't get into a room unless you click on the button. So that doesn't mean it's politically protected speech. You can't get in to see what's there until you click on the Like button. It's not. It's different, and Judge Daxton concluded it was different than a specific posting when you say you post on—you write, I support Mr. McAdams for sheriff. He's going to do a good job. That is speech. Clicking is not. It's opening a door. It can be accidental. You may not know what the consequence is. And there are 3 million Likes, clicks a day. Is each one of those intentional speech? I don't think so. But that's up to the court to decide. Maybe you may think it is. So anyway, so on the issue, that's on the issue for McCoy. Carter, as far as Carter goes, he had numerous disappointing actions and actions against him, which the sheriff relied on in making his decision. He had released several inmates improperly from the jail prematurely, and that's obviously a very serious offense. As far as his picture on Facebook, I asked him, well, what did you think the sheriff concluded from that? And he said he didn't know what the sheriff concluded from having his picture on Facebook. And I don't know that the sheriff concluded anything. He didn't say that he concluded that or considered that in making his decision. Adams worked in this department for numerous years, and he was friends with many of the deputies. So the fact that you click on his Facebook, I don't think that necessarily means that you're supporting him. It may mean you're curious about what he's doing. And Judge Jackson concluded that the court had not found any evidence of the statement of support Carter had made, is what Judge Jackson said. He didn't find a statement of support in the Facebook pages, in the record, in joint appendix 576, 77, 78. He didn't find anything that Carter said that was a statement of support. And I agree with him. There isn't anything that says it's a statement of support. There's nothing here that says that. If he had said, yeah, I support Adams for sheriff, he'd do a better job than Sheriff Roberts. That's a statement of support. There's nothing like that in this record. And so that's why I would suggest that Judge Jackson was correct in concluding that there was no evidence to support his position. I think this case is more like the case of Smith v. Frye, in which that case there was insufficient evidence that the plaintiff had even engaged in a First Amendment speech, but rather she testified she believed the sheriff knew that she supported the opposition candidate. And that's the same in this case. Each plaintiff, I ask each plaintiff, why do you think the sheriff knew that you supported the opposition candidate? They also kept it secret. But then different people, you know, Sandhoffer says, oh, because my girlfriend had a bumper sticker on her car. Did you know the sheriff saw that? No. My girlfriend was working at the polls and the sheriff saw her. Well, how does that mean that he knows you support? He couldn't answer that question. The same thing with Bland, Woodward, all of them. It's only they say, well, I think the sheriff knew, but they didn't compel any evidence that he knew. And the evidence the sheriff testified was candid. He said he had reasons, and he identified the reasons for terminating each of the people. Woodward and Bland were replaced with sworn deputies because he had a reduction in the number of deputies that the Comptroller was giving him. So instead of using civilians, he replaced those positions with deputies. That's a valid reason. Dixon had breaches of the standard of conduct and had rocky tenure. He was in multiple positions over the course of his tenure. Are you on the association claims now? Yes, Judge. Okay. I had a question about Woodward. The sheriff, as I recall, as to Woodward, said he wanted to put a deputy, sworn deputy maybe, in that position. Correct. So they said, well, why didn't you put her? He said, I offered it to her one time. She turned it down. Correct. But she says he never offered it to me. So if the jury believes her, then his reason that he's giving is untrue. And couldn't a jury logically conclude from that, then, that the illegal purpose was the real reason? I think, Sheriff, Judge, I think that what the testimony was, that he had not offered it to her at the time, right before he replaced her, but he had offered it to her previously, and he knew she didn't want to go through the academy. And so that was just a consideration. I think that was just a consideration. She said he never offered it to her, ever, as I recall. Right. I don't think that, as I recall the testimony, I thought he said he had offered her, or he knew that she would not want to go to the academy. I can't recall if he specifically offered it to her, or he knew that she was an older woman and would not want to go through the academy. So I don't think that makes a jury issue on that issue, Judge. I don't think, I think that, I mean, the plaintiffs have a very strong, because they have to prove, but for the reason that that was why the Sheriff made the decision. No, no, but if the reason he gives is false, the jury finds that it's false. They look at the testimony and, like most people, to her, they say his reason is false. Can't they conclude from that, then, logically, that the real reason is that his reason is a pretext, basically, to use other language from other people? I think if that was the only issue, Judge, I think that's true, but I think, in light of all the testimony, that she kept everything secret and that he would have no way of knowing of her political affiliation, there wouldn't be enough evidence to support that position. I mean, I don't, there's really, on her, there's no evidence. She also says she kept everything secret. There's no way he, she has no evidence to suggest that the Sheriff knew her affiliation whatsoever. So your strongest point on that is that he didn't know what she was doing? Correct, correct. And I think that's, Judge, I think that's really true on all of them, except that the people that claim the Facebook, and then the other issue is Dixon, is Dixon, and on the Dixon issue, the Judge correctly concluded that his statements as he walked out of the poll were more of a grievance against his employer, not a statement of political content that the community would have been involved with. And I believe that that was an accurate conclusion. That was not politically protected speech. And even as it is, I would respectfully submit that qualified immunity would protect Sheriff Roberts on both claims, on the First Amendment claim and on the political association claim. Under the Jenkins case, I think he was reasonable in relying on the fact that under the law, sworn deputies, he could consider political affiliation of sworn deputies. That's what the law was at the time. And as far as Woodward and Bland, they clearly were in confidential positions. Bland was in charge of the budget. He had all the budget for the Sheriff's Department, the inmate funds. He had contact with all the vendors. He clearly represented the Sheriff and had private confidential information. And the Sheriff would need to expect loyalty from him, as well as with Woodward's position. She was in charge of personnel. She had all the hiring, all the training, contact with all the trainers. She also was in a confidential position, much like the President's Cabinet. And the President obviously can consider political loyalty in determining who is in his Cabinet. And similarly, I think the Sheriff in this case has the right and the ability to take and consider loyalty in making that decision. And so for those reasons, we would ask the Court respectfully to uphold the finding of the lower court. Thank you, Mr. Rosen. Thank you. Shoemaker. First with respect, may it please the Court, first with respect to Deputy McCoy. Evidence in this record that he was on Facebook and the context in which he was on Facebook appears at the joint appendix at page 592 where Deputy Sandhofer says he saw it. Captain McGee's testimony is at page 680, 681. Colonel Bowden's testimony is at page 42 and page 484 where she saw it. And then at the same place says she reported Carter and McCoy at the same time to the Sheriff. Carter's testimony, saying that he saw McCoy's Facebook posting indicating support for the Sheriff, appears at page 571. And McCoy's testimony and his declaration is at page 586. This idea that an accidental expression is not protected by the First Amendment utterly fails. Is that an issue in this? No. In the briefs? It's not. I'm just surprised. It's not, but it's been raised in oral argument and I want to use an analogy. If I'm at work and I'm passing an employee a note and that note expresses my political preference for a candidate, but I want to keep it concealed from my employer, but it is revealed to him, it is still protected speech irrespective of the fact that unfortunately for me it's revealed to my employer and he wants to fire me for it. It is still protected speech. That assertion should bear no weight whatsoever. With respect to Dixon, it's important to get into some of these other deputies. Dixon leaves the polling place. He tells Francis Pope, looking at Sheriff Roberts' campaign literature, you can throw that stuff away. By the time he gets back to work, his boss knows about it. The Sheriff claims he fired Dixon because he said to Francis Pope, you can throw that effing blank away using expletives. That's what the Sheriff says. But the Sheriff never even bothered to make any inquiry with Dixon whether that in fact occurred. Dixon was a 13-year employee and contrary to the representations of Mr. Rosen, all of these employees had excellent records. All of them. It's uncontradicted that they all had above average performance or outstanding performance in this record. So here we have a 13-year employee. He tells a campaign worker, she can throw Sheriff Roberts' literature away. By the time he gets back to the office, his supervisor knows about it and he's fired without anyone asking him what happened almost immediately. Dixon also had a bumper sticker on his car and that cannot be ignored in this environment. This is an environment where things are done on the clock. The Sheriff hosts political events on the clock. Employees are out working these events on the clock. They are planning the events on the clock. Majors and captains are going around selling tickets. They're going around inquiring of people what they will do for the Sheriff. Will you work a poll? What's the relevance of all this with regard to these issues? Judge, when it comes to the indirect evidence in this case, we should benefit from an inference that given the intense political activity in this office, this information was getting upstairs very fast. There's no better example than Dixon at the polls and by the time he gets back to work, his supervisor knows what happened at the polls. And that's your response to the fact that there's no evidence that the Sheriff knew that Dixon had a bumper sticker? With respect to the bumper sticker, yes, Judge Thacker, that is my position. But it doesn't rise or fall on the bumper sticker alone. The Sheriff clearly knew about Francis Thacker. That is patent in this record. I'm sorry. Clearly knew about Francis Pope. That is patent in this record. Clear in this record. So Dixon clearly engaged in protected speech. Mr. Sandhofer, he was executive director of one of downtown Hampton's most prominent marketing groups. As soon as he is hired into this office, he is put to work basically schmoozing the downtown business community on behalf of Sheriff Roberts. Colonel Bowden has him go out to do that. When it came time for the 2009 campaign, she asked him, go get us signs in downtown Hampton for Sheriff Roberts. He refuses to do it. I'm going to interrupt you. Sorry. That's just the process. But I have a question I need to ask you that's not relevant to what you're... You're depending a lot on circumstantial evidence to establish knowledge of the Sheriff with regards to many of these activities. How would a jury reasonably distinguish between what the Sheriff knew and what he didn't know when you are relying on this type of circumstantial evidence? Well, in the case of Sandhofer... Your presumption is he knew everything. In the case of Sandhofer, that interchange with Colonel Bowden... I'm not talking about specific here. You may be able to point to specifics here. But how is a jury going to determine without direct evidence that he knew what he knew and what he didn't know? Fair enough, Chief Judge Trackler. But let's make clear. This only applies to Sandhofer, Bland, and Woodward. This indirect evidence problem does not apply to Carter, McCoy, and Dixon. But my response to the question is, again, I have to recur to the intensity of the political activity in this office. He had majors and captains going around all the time soliciting activity and monitoring political activity. And it was reported up the chain of command. A great example of this is the cookout. Ramona Larkin, a rank-and-file deputy, hosts a cookout with Danny Carter. Jim Adams, the opponent in the November campaign, shows up at the cookout. The cookout is end of August, 2009, right before Labor Day, right at the kickoff of the season. Well, the Monday after the cookout, Ramona Larkin is approached by Major Richardson. And he says, hey, I heard Jim Adams was at your cookout. And Ramona Larkin's response is, I didn't invite him, I didn't invite him. Danny Carter invited him. And he stated to her, and it's in the record, well, you need to make that clear to the sheriff because this looks like a political event and, quote, it does not look good. So this is the environment they were operating in. This is what they were dealing with. And in this cauldron, information got to the sheriff with lightning speed. The conduct in this case is extraordinary. Sheriff Roberts has succeeded in uniting the ACLU and the police. Not that common an occurrence. And he has succeeded in this because the conduct was so egregious. I have nothing further. Thank you.
judges: William B. Traxler Jr., Stephanie D. Thacker, Ellen L. Hollander